PHINIZY et al. v. AUGUSTA & K. R. CO. et al.

CENTRAL TRUST CO. OF NEW YORK v. PORT ROYAL & W. C. RY. CO. et al.

(Circuit Court, D. South Carolina. August 16, 1894.)

1. RAILROAD COMPANIES—CONSOLIDATION—RATIFICATION.

An agreement was entered into for a consolidation of several railroad companies, which was in compliance with the statute (Gen. St. S. C. § 1426) providing therefor, and was executed by each board of directors, and submitted to the stockholders of the several companies. The min- utes of the action of three of the companies, confirming the agreement, were in evidence, but the minutes of the other company had been lost. The old stock was surrendered, and the new certificates accepted. The

new company took full charge and control of all the component roads without question or exception, and for years exercised such control, and immense advantage resulted to the railroad from such consolidation. *Held* to show that the agreement was accepted and ratified.

2. SAME.

It was not an essential prerequisite to such consolidated companies acting as a corporation that the agreement should have upon it the certificates of the several secretaries of each of the railroad companies that it had been accepted.

3. CORPORATIONS—MORTGAGES—RIGHT OF STOCKHOLDERS TO QUESTION VALIDITY.

Where an organization assumes to act as a corporation, and issues bonds secured by mortgage, and puts the bonds in circulation, persons holding stock in the corporation, as such, cannot defeat the bonds and mortgage by alleging that the corporation was not duly incorporated.

4. RAILROAD COMPANIES — RIGHT OF DIRECTORS TO ISSUE MORTGAGE WITHOUT VOTE OF STOCKHOLDERS.

Gen. St. S. C. §§ 1427, 1428, provide that, on the consummation of the act of consolidation by several railroad companies, the rights, privileges, and franchises of each of the corporations, parties thereto, shall be deemed vested in and transferred to such new corporation without any further act of deed. *Held*, that where each of the corporations, at the date of the consolidation, had outstanding bonds, secured by mortgages, under proper authority, the directors of the new corporation may, without the vote of the stockholders, issue a mortgage on the property of the new corporation in order to take up and substitute bonds of the new corporation for the bonds of the old corporations.

Bill by the Central Trust Company of New York against the Port Royal & Western Carolina Railway Company and others to foreclose a mortgage. The counties of Laurens, Spartanburg, and others file a cross bill denying the validity of the mortgage.

J. R. Lamar, C. C. Featherstone, N. B. Dial, and S. J. Simpson, for complainants in cross bill, Laurens county and others.

H. B. Tompkins, Lawton & Cunningham, and Mitchell & Smith, for defendants in cross bill.

SIMONTON, Circuit Judge. This case now comes up to be heard upon the cross bill of the cities of Anderson and Greenville and of the counties of Laurens, Spartanburg, Anderson, and Greenville, and the answers thereto. It will be impossible to come to a conclusion upon the principles of law governing this case without a full statement of the facts.

There were in the state of South Carolina several small railroads, independent of each other, but connecting at a common point, and, in a sense, auxiliary. One of these was the Augusta & Knoxville Railroad, some 68 miles in length, and completed from Augusta, Ga., to Greenwood, S. C.; another, the Greenwood, Spartanburg & Laurens Railroad, about 66 miles long, having its termini at Spartanburg and Greenwood, and passing through the town of Laurens; and yet another, the Greenville & Laurens Railroad, 36½ miles long, connecting Laurens and Greenville; another, the Savannah Valley Railroad, extending from McCormack, S. C., to Anderson, S. C., some 58½ miles. These five towns (Greenville, Spartanburg, Laurens, Anderson, and Greenwood) are the important trade centers in upper South Carolina; and these roads put them in close con-

nection with the city of Augusta, Ga., and, through Augusta, with the great ocean highways. Of them, the Augusta & Knoxville had the most important function, connecting their common center, Greenwood, with Augusta, and, to adopt a homely expression much used in the hearing of the case, was "the neck of the bottle," to this network of railways. From Augusta there ran the Port Royal & Augusta Railway, connecting Augusta with the harbor of Port Royal, giving immediate access to the ocean. The amalgamation and consolidation of these lines of railroad were fraught with so many desirable results as to seem almost a natural necessity. They go without saying. The Central Railroad & Banking Company of Georgia had an eye to these advantages. The several roads were weak; some of them in an incomplete state; all of them deficient in plant, and more or less moribund. In various ways,— by purchase of stock and of bonds, by construction contracts, originally undertaken, or assigned to it, and otherwise,—this great system obtained a controlling voice in each of these lines of railway, and proceeded to take the steps leading to their consolidation. The people of Greenville, Spartanburg, Laurens, and Anderson had long seen the advantages to be derived by their counties, and the cities and towns in them, from the building of these several roads, and had, by public subscription, shown their faith in them. The county of Spartanburg had issued county bonds to the amount of $75,000 to pay a subscription of the same amount in stock of the Greenwood, Spartanburg & Laurens Railroad Company; the county of Laurens had issued county bonds to the amount of $150,000, and had invested $75,000 of the proceeds in stock of the same railroad company, and a like amount in stock of the Greenville & Laurens Railroad Company; the city of Anderson had issued its bonds for $50,000, and had used them in subscribing $50,000 stock in the Savannah Valley Railroad; the city of Greenville had issued $25,000 in bonds, and had taken a like amount of stock in the Greenville & Laurens Railroad Company; and the county of Greenville issued $50,000 worth of bonds, and subscribed for the same amount of stock in the same railroad. Each of these counties and municipalities had representatives in the several boards of directors controlling these companies, respectively. Their consolidation having been determined upon by the Central Railroad & Banking Company of Georgia, the controlling stock and bond holder, and the charters of each of the roads authorizing consolidation with other roads, steps were taken for the compliance with the statutory provisions of the state of South Carolina in such case made and provided. Such consolidation is permitted in South Carolina to any railroad company organized under the laws of that state, and having its track, in whole or in part, within this state, whenever the railroads proposed to be consolidated form a continuous line of railroad with each other, or by means of any intervening railroad. Gen. St. S. C. § 1425 (Pub. Laws S. C. § 1536). These conditions were fulfilled in the present instance. The question of consolidation was submitted to each separate railroad company, and the result was the preparation and execution of formal articles of agreement

some time about 27th October, 1886, by and between the directors of the Port Royal & Augusta Railway, the Greenwood, Spartanburg & Laurens Railroad Company, the Greenville & Laurens Railroad Company, the Augusta & Knoxville Railroad Company, and the Savannah Valley Railroad Company, in which it was agreed to consolidate all these railroads into one company, to be called the Port Royal & Western Carolina Railway Company, under the provisions of the act of assembly of the state of South Carolina of 1882, to be found in the Statutes at Large of said state (volume 17, p. 795, §§ 14–20, inclusive, incorporated in the General Statutes as sections 1425, 1433, inclusive; Pub. Laws, §§ 1536, 1542, inclusive). This agreement provided capital of $2,000,000 preferred stock, $4,-000,000 common stock, in shares of $100 each; the existing stock in all the railroads but the Augusta & Knoxville to be exchanged, dollar for dollar, in common stock of the new company, and the stock of the Augusta & Knoxville to be converted into a liability of the new corporation, and the holders to be paid the value thereof. This agreement contained, as its last and concluding clause: "Shall any one of the companies named fail to enter into this agreement, the remaining parties hereto shall continue, perfect, and carry out this agreement upon the terms hereinbefore set out." This agreement was signed by the president and each director of each company, and was duly ratified and confirmed by the stockholders of the Greenwood, Spartanburg & Laurens Railroad, the Augusta & Knoxville Railroad Company, and the Savannah Valley Railroad, as their minutes show. The minutes of the Greenville & Laurens Railroad are not to be found; but, from the date of the agreement to the filing of this cross bill, this road has been included in, controlled by, and has been known as a part of, the Port Royal & Western Carolina Railway Company, without protest or objection or exception, so far as the evidence discloses, on the part of any one, and it may well be assumed that its stockholders also assented. The stockholders of the Port Royal & Augusta Railway Company, referred to, refused to confirm the agreement, and that company never has been recognized as a part of the Port Royal & Western Carolina Railway Company. This, as has been seen, did not, under the terms of the agreement, impair it as to the others, who, in its words, had agreed, in an event like this, to continue, perfect, and carry out the agreement. The agreement was duly recorded in the office of the secretary of state, as required by law; all the provisions of the act being complied with, except that the fact "that a majority of all the votes of all the stockholders of each company had been for the adoption of the agreement" had not been certified "upon the agreement by the secretary of the respective companies, under the seal thereof," which certificate is provided for in the act. The Augusta & Knoxville Railroad Company is a corporation of the state of Georgia, as well as of South Carolina. The Georgia act permits consolidation with other companies. At the date of the agreement, each of the railroad companies mentioned in it was under mortgage to secure outstanding bonds:

The Greenwood, Spartanburg & Laurens Railroad, in the sum of..  $660,000
The Savannah Valley Railroad, in the sum of......................   500,000
The Greenville & Laurens Railroad, in the sum of.................   300,000
The Augusta & Knoxville Railroad, in the sum of.................   630,000

This agreement having been recorded, stock was issued in the new company, and certificates thereof were delivered, share for share, in lieu of the stock held in the several companies; each of the counties and cities, complainants in the cross bill, surrendering the stock held by it in the several companies, and receiving in lieu thereof the shares in the new company. No one of them availed itself of the provisions of section 1432, Gen. St. S. C. (section 1543, Pub. Laws), providing a mode of relief for stockholders of consolidating companies who may be unwilling to convert their stock into the stock of the consolidated company; a proceeding which must be begun within 30 days after the adoption of the agreement of consolidation, not after its record. After the consolidation agreement was made, the Port Royal & Western Carolina Railway executed a mortgage of all its property to the Central Trust Company of New York to secure an issue of coupon bonds, payable to bearer, bearing interest at 6 per cent. per annum, payable by coupons, to the amount of $2,500,000,—the mortgage now in question. Of these bonds, $630,000 were to be reserved to retire an equal amount of first mortgage bonds of the Augusta & Knoxville Railroad Company. Of them, an amount of $1,460,000 was used in retiring and satisfying the outstanding bonds of the other companies in the combination, $88,400 in taking up and canceling stock of Augusta & Knoxville Railroad Company, and $321,600 were reserved for the purposes of 'the Port Royal & Western Carolina Railway Company, in necessary improvements and additions to its property.

The Central Railroad & Banking Company had become the owner of the bonds of all of these roads but the Augusta & Knoxville, and was the principal if not the sole owner of the stock of this last-named railroad. So it became possessed of nearly all of the bonds of the Port Royal & Western Carolina Railway Company which were issued. The trustee still holds the bonds reserved for exchange with the bonds of the Augusta & Knoxville, and a part of the other reserved bonds are still on hand. The Central Railroad & Banking Company of Georgia hypothecated all of its bonds—$1,460,000—with the Central Trust Company of New York, and a number of other securities, as collateral to a loan effected with the trust company. No interest coupons have been paid on these bonds of the Port Royal & Western Carolina Railway Company, and the Central Trust Company, as trustee holding the mortgage securing them, brought the bill to foreclose the mortgage, to which this cross bill was filed. This trust company holds many of these bonds, as has been stated, as collateral. The bill, however, is filed by it as trustee, and other parties, claiming to be holders, by purchase, of the bonds, have proved them in this suit.

From the date of the first meeting of the Port Royal & Western Carolina Railway Company to the present time, the stock in that

company held by these various municipalities has been repre-
sented at its annual meetings; and gentlemen of excellent char-
acter and standing, leading citizens of the municipalities, holding
few, in some cases no, shares in the company, have served on its
board of directors as representatives of the municipalities. There
appear many irregularities in the time and mode of selecting them.
Yet their service was a matter of notoriety, their right was never
disputed, nor were any other persons ever selected, regularly or oth-
erwise, to serve in the places they filled.

The question made by the cross bill is as to the validity of the
mortgage which the original bill seeks to foreclose. The cross bill
denies that there is, or ever has been, a lawful corporation known
as the Port Royal & Western Carolina Railway Company, and that
all so-called corporate acts alleged to have been performed by it are
void. This averment is made on many grounds. They go to fraud-
ulent conduct in getting up the agreement for consolidation, a want
of compliance with the provisions of the acts of assembly in such
case made and provided, and to improper and unlawful conduct of
the Central Railroad & Banking Company, in possessing itself of
the bonds issued by the company. It is also denied that the mort-
gage is valid, because it was executed under a vote of the directors,
and not of the corporation. It is claimed with great earnestness
that one essential feature of this consolidation—the inducement con-
trolling the counties and cities—was that the Port Royal & Augusta
Railroad Company formed a part of it; that the name of this company
was inserted in the agreement and in the title of the new company;
and that the failure upon the part of this company to join in the
agreement invalidated it, especially as this failure was brought about
by the machinations of the Central Railroad & Banking Company,
the chief promoter of the enterprise, in order to suppress a com-
petitor. Whatever may have been the hopes, expectations, or mo-
tives of the parties to this agreement, its validity must be determined
by the considerations expressed in it, and not by those dependent
on extraneous parol evidence. This agreement expressly provides
for the failure of any one of the companies named in it to enter into
the agreement, and binds the remaining companies, notwithstanding
such failure, to continue, perfect, and carry out the agreement upon
the terms set out. The agreement is the joint agreement of the di-
rectors of these several corporations, under the corporate seal of
each. It proposes the consolidation of these companies. It pre-
scribes the conditions and terms, and the mode of carrying them
into effect. It gives the name of the new corporation, the number
and names of the directors and other officers; declares who shall
be the first directors and officers, and their places of residence. It
gives the number of shares of the capital stock, the amount or par
value of each share, the manner of converting the capital stock of
each of the companies into that of the new company; that is to say,
by the purchase of all of the stock of the Augusta & Knoxville, and
by the exchange of the new stock with the old stock, share for share,
of the other companies. When it is considered that the Augusta
& Knoxville was absolutely necessary to this whole scheme, and

without its aid the measure would have failed,—was in fact the neck of the bottle of the system,—this arrangement was wise and natural. The agreement further states when and how the directors and officers shall be chosen. Comparing the agreement with the words of the act, it complies, almost in ipsissimis verbis, with its requirements. Pub. Laws S. C. § 1537 (Gen. St. S. C. § 1426). The agreement, having been executed by each board of directors, was submitted to the stockholders of the several companies. The evidence discloses the minutes of the action of three of them, confirming and approving the agreement. The minutes of the other company have been lost, and cannot be produced. But we have the fact that the old stock was surrendered, and the new certificates accepted; that the new company took full charge and control of all the component railroads, without question or exception, and has for years exercised this control. When we consider these facts, and the immense advantage to the railroads from this consolidation, and the great public benefit derived therefrom; that each railroad was rescued from a moribund condition, and put in condition for traffic; that the railroads from Greenville, Anderson, Spartanburg, Greenwood, and Laurens were secured an outlet to market,—we cannot avoid the conclusion that the agreement was accepted and ratified. The agreement was then recorded, as required by law, in the office of the secretary of state. It did not have upon it the certificates of the several secretaries of each of the railroad companies that it had been accepted. Was this an essential prerequisite before the consolidated company could act as a corporation? It would seem that, at the most, this was only evidence of the fact,—the best and most conclusive evidence,— but that its absence could be supplied aliunde. Here note that under section 1432, Gen. St. (section 1543, Pub. Laws) an objecting stockholder would lose his remedy if he did not apply within 30 days from the date—not from the record—of the agreement. It must be kept in mind that the consolidation of railroads does not create a new corporation, with powers of its own, distinct from, greater or less than, those enjoyed by the consolidating companies separately. It is a method provided by law for the formation of a copartnership between railroad corporations, by which, if the expression may be used, they pool their franchises and property, and are enabled to act in complete harmony under one head, as a unit. This unit possesses the powers of its component parts,—no more and no less. Section 1538, Pub. Laws (Gen. St. S. C. § 1427). And the act authorizing it provides a method of advertising the state that this copartnership has been formed. No further grant of a franchise is necessary, nor is any given. Indeed, it is an accomplished fact, requiring no further act or deed on the part of the state, or any one else. Gen. St. § 1428 (Pub. Laws, § 1539). At all events, the consolidated company assumed to act as a corporation, and issued its coupon bonds, secured by mortgage, and put these bonds in circulation. These bonds and this mortgage are now resisted by parties holding stock in the corporation as such, permitted to intervene in this case in order to do that which the corporation could, but will not, do. "A person who has given a bond to a corporation is not

allowed to defeat the bond by alleging that the corporation was not duly incorporated, nor can a corporation defeat its bonds by alleging a want of lawful incorporation. A person who mortgages land to a supposed corporation cannot defeat a foreclosure of the mortgage by alleging that the mortgagee is not a corporation. Nor can the corporation itself, having given a mortgage, defeat a foreclosure by such a plea." Cook, Stock, S. & Corporation Law, § 637, and cases cited; Wallace v. Loomis, 97 U. S. 146. Assuming to act as a corporation is claim of a franchise. If invalid, it is an offense to the sovereign, cognizable by it alone. "No one is allowed to assert that the corporation is dissolved, or its franchise is forfeited, or its incorporation illegal, until after that result has been decreed by a court in a proceeding instituted for that purpose." Cook. supra. "In general, the courts do not allow parties to suits on contracts to question the due incorporation of a company which it was possible to incorporate, which has attempted to incorporate, and which has acted as a corporation." Id.

It is further objected that this new mortgage was not submitted to the corporation for approval, but was the act of its directors. Under the law of South Carolina (Gen. St. S. C. §§ 1427, 1428; Pub. Laws S. C. §§ 1538, 1539), it is provided that upon the consummation of the act of consolidation the rights, privileges, and franchises of each of the corporations, parties to the same, shall be taken and deemed to be vested in and transferred to such new corporation, without any further act and deed. Each of these corporations. at the date of the consolidation, had outstanding bonds secured by mortgages under proper authority. The main purpose of the new mortgage was to take up them, and substitute the bonds of the new company. The bonds and mortgage so substituted were authorized and sustained by the same powers. "The directors alone, without the vote of the stockholders, may authorize a mortgage to be made; and, even though there is a question as to their authority, the validity of the mortgage. as against the corporation, is established by its affirmance of it by the issue of bonds under it." Wood, R. R. p. 1951, § 461, quoting McCurdy's Appeal, 65 Pa. St. 290; Hadden v. Railroad Co., 7 Fed. 793. "If the act authorizing the mortgage requires a concurrence of the majority of stockholders, it is held that this is a requirement in which the public have no interest." Thomas v. Railroad Co., 104 Ill. 462. The question now under consideration is the validity of this mortgage in the hands of the trustee. Nothing is decided with respect to the claims of other than bona fide holders of the bonds held under it. With regard to the rights of the Central Railroad & Banking Company, they cannot be passed upon at present, because this corporation is in no sense a party hereto. For the same reason, it cannot be decided how far the pledgees of these bonds are affected by the defects in the title of the Central Railroad & Banking Company, nor can a decision be made as to the misuse of any of these bonds. All these questions can come up, and can be decided, when proof is made, or attempted to be made, of bonds in the hands of holders presenting them. Nor is the case ripe for an opinion how far a decision declaring the invalidity of bonds under

this mortgage would affect the rights of holders of bonds covered by separate mortgages on the several roads, who surrender and exchange their bonds for the new bonds. All that is now decided is that the mortgage set up in the original bill by the Central Trust Company of New York, upon the franchises, property, and assets of the Port Royal & Western Carolina Railway Company, is a good mortgage, and that the rights of bona fide holders of the bonds issued thereunder before maturity, and without notice, will be protected; and it is so ordered. The cross bill will be retained for further proceedings in this cause, and will not be dismissed.